## UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, **Luis Polo**, being duly sworn, do hereby depose and state the following:

1.      I am a Border Patrol Agent with the United States Border Patrol and have been so employed since March 27, 2006.  As a Border Patrol Agent, I have gained experience in conducting investigations related to the illegal entry of aliens into United States.  I attended the Federal Law Enforcement Training Center at Artesia, New Mexico, where I received training for the purpose of accomplishing my Border Patrol duties, which includes training in immigration related law and matters.  Furthermore, I also receive training on a continuing basis for the purpose of maintaining my proficiency pertaining to Border Patrol work.

2.      Investigation reveals that, on or about Monday, July 20, 2026, **Edwin Alejandro Díaz-Cordero ("DÍAZ")** was found in the United States territory, upon being dropped off and eventually encountered at or near Culebrita Island, Puerto Rico.  Therefore, this Affidavit is made in support of a Criminal Complaint against **DÍAZ** based on violation of **Title 8, _United States Code_, Sections 1326(a) & (b)(2).**

3.      I make this affidavit based on my own personal knowledge and on oral and written reports by other federal, state, and/or local law enforcement agents and officers that investigated this matter.  This affidavit does not contain all the information derived from this investigation only that which is sufficient to demonstrate probable cause to believe that a crime has been committed.

1

**PROBABLE CAUSE**

4.      On or about Monday, July 20, 2026, at approximately 02:00 a.m., Border Patrol Agents (BPAs) were assigned to Operation Eastern Front conducting coastal patrol operations at sea along with Customs & Border Protection (CBP) Air & Marine Office (AMO) Fajardo Marine unit near Culebra, Puerto Rico.

5.      This area is known for frequent drug and migrants smuggling activity.

6.      BPAs and Marine Interdiction Agents (MIAs) received information from the Caribbean Air & Marine Operations Center (CAMOC) that a target small vessel with potentially multiple subjects onboard had been detected on the Marine Approach Surveillance Tower (MAST) departing St. Thomas, USVI, and heading toward Culebra, Puerto Rico.

7.      At approximately 03:55 a.m., AMO Marine Unit from St. Thomas, USVI advised they encountered a vessel matching the description and conducted a marine interception due to the vessel operating without navigation lights.  Within a few minutes the other boat with BPAs arrived on scene.

8.      Upon arrival on scene, MIAs and BPAs identified themselves as immigration officers and proceeded to interview intercepted subject at sea.  The intercepted at sea subject was later identified as Gregory VEGA.

9.      MIAs and BPAs questioned VEGA, as to his citizenship and nationality.

10.     VEGA freely and voluntarily admitted to being a United States citizen from Culebra, Puerto Rico but currently residing in Mayaguez, Puerto Rico.

11.     BPA proceeded to interview VEGA, who sated he was coming from St. Thomas, USVI, and claimed he had traveled there to purchase the boat he was operating.

12.     When asked for boat registration and ownership information, VEGA stated he did

2

not know the owner and had no paperwork or registration for the vessel, however he claimed to have paid eleven thousand ($11,000.00USD) dollars to an unknown person for the boat.

13. BPA requested VEGA to produce an identification.

14. VEGA stated his identification (ID) was inside his bag and granted consent for a search.

15. BPA found inside a bag three (03) cellphones and a bag containing what he claimed to be six to seven thousand dollars.

16. When questioned again about the boat's ownership, VEGA repeated that he did not know and stated that he bought it from someone who brought it to him in St. Thomas, USVI.

17. Due to previous similar trends for illicit activities, known human & narcotics smuggling routes, the time of night, the vessel operating without navigation lights, and inconsistencies in VEGA's story, BPA further questioned him about the real purpose of his travel.

18. Upon questioning, VEGA then admitted that he was transporting ten (10) subjects from St. Thomas, USVI and attempting to smuggle them to Culebra, Puerto Rico.

19. When questioned where he had dropped off the subjects, VEGA stated he had left them at or near Culebrita Island, Puerto Rico, which is uninhabited and lacks fresh water or food resources.

20. While VEGA was then detained for investigative purposes and transported by boat to the Air & Marine Office facility in Ceiba, Puerto Rico, BPAs conducting the questioning during intercept at sea, deboarded one boat, and boarded another CBP-AMO boat from the upcoming morning shift to go and conduct a search and rescue of the alleged immigrants left stranded at or near Culebrita Island, Puerto Rico.

3

21.    BPAs went into Culebrita Island to conduct a search and rescue to try to possibly rescue all abandoned subjects.

22.    At approximately 07:30 a.m., agents located and rescued the ten (10) abandoned subjects, among them was an alien later identified as **DÍAZ**, who was left stranded at or near Culebrita Island, Puerto Rico.

23.    All ten (10) subjects, including **DÍAZ**, were encountered alive and in good health condition.

24.    Upon encounter, BPA identified himself as an immigration officer.    Upon questioning all subjects, including **DÍAZ**, they all indicated their respective nationalities. **DÍAZ** indicated he was from the Dominican Republic, four (04) subjects from India and five (05) subjects from Ecuador.

25.    **DÍAZ** indicated that he was a national citizen from the Dominican Republic. He also admitted to being in the United States illegally.

27.    All subjects, including **DÍAZ**, were transported by boat to the Air & Marine Office in Ceiba, Puerto Rico for further investigation, questioning and processing.

28.    United States Border Patrol Ramey Sector was informed, and dispatched additional BPAs to assist from Aguadilla, Puerto Rico to Ceiba, Puerto Rico.

29.    Upon arrival at Ceiba, Puerto Rico, BPAs from Ramey Sector in Aguadilla, Puerto Rico proceeded to assume custody of all subjects, including **DÍAZ.**

30.    All subjects, including **DÍAZ**, were arrested transported from Ceiba, Puerto Rico to U.S. Border Patrol Ramey Station in Aguadilla, Puerto Rico by land on patrol vehicles.

31.    Upon arrival at Ramey Station in Aguadilla, Puerto Rico; all subjects including **DÍAZ**'s photograph and fingerprints were taken and entered to different law enforcement

4

database systems. Record checks yielded positive prior record for **DÍAZ** regarding prior immigration & criminal history.

32. As to **DÍAZ**'s prior immigration and criminal history:

(a) On or about May 23, 1994, at the age of twelve (12), **DÍAZ** legally entered the United States through the Port of Miami, Florida as a Legal Permanent Resident (IR2).

(b) On November 04, 1999, **DÍAZ** was arrested for shoplifting by Boston Police Department. On February 04, 2000, **DÍAZ** was convicted in the West Roxbury District Court and sentenced to community service.

(c) On June 27, 2005, **DÍAZ** was convicted of Possession to Distribute a Controlled Substance Class A; to wit Heroin & sentenced to eighteen (18) months suspended sentence until December 26, 2006; a violation of probation extended the suspended sentence until December 14, 2007. This is a felony conviction.

(d) On August 27, 2012, **DÍAZ** came to the attention of the Immigration & Customs Enforcement (ICE) Boston Fugitive Operations Program in preparation of Criminal Alien Removal Initiative. **DÍAZ** was being held at the Essex County Sheriff's Department in Middleton, Massachusetts.

(e) On August 27, 2012, **DÍAZ** was processed and served with a Notice to Appear before an Immigration Judge.

(f) On November 04, 2013, **DÍAZ** was ordered removed from the United States by an Immigration Judge.

(g) On January 30, 2014, **DÍAZ** was administratively ordered to be removed / deported.

(h) On December 02, 2014, **DÍAZ** was officially and physically removed from the United States to the Dominican Republic from the Port of Alexandria, Louisiana.

33. Border Patrol Agents advised **DÍAZ** of his right to legal representation & his right to speak with the Consular Officer of his native country, the Dominican Republic.

34. **DÍAZ** re-entered the United States at a place other than a designated Port of Entry.

35. **DÍAZ** is a national and citizen of the Dominican Republic who does not possess any immigration documents allowing him to enter and/or remain in the United States legally, to include but not limited, the lack of express consent from the Attorney General of the United States, or his successor, the Secretary of the Department of Homeland Security, to reapply for admission into the United States. Furthermore, **DÍAZ** was not inspected, admitted, or paroled into the United States by an Officer of the Bureau of Customs & Border Protection.

36. **DÍAZ** does not have any petitions pending with the Bureau of Citizenship and Immigration Services.

37.    Based upon my training, experience, and participation in other investigations, and based on the facts revealed in this investigation, I believe that sufficient probable cause exists to demonstrate the commission of a violation of federal law by the above-mentioned subject, to wit, a violation of Title 8, *United States Code,* Section 1326(a) & (b)(2) – Reentry of Removed Alien subsequent to an aggravated felony conviction.

Luis Polo
Border Patrol Agent

Sworn before me pursuant to FRCP 4.1 at _1:46 PM_ by telephone, this _24th_ day of July 2026.

Honorable Marcos E. López
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF PUERTO RICO